# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JOSEPH PARKER**                                      **CIVIL ACTION**

**versus**                                             **NO. 13-3857**

**WARDEN STEVE RADER**                                 **SECTION: "F" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that the matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Joseph Parker, is a state prisoner incarcerated at the Dixon Correctional Institute, Jackson, Louisiana. At his third trial on November 30, 2010,[1] he was convicted of simple

---

[1] His first trial ended in a mistrial and his second trial resulted in a hung jury.

burglary of an inhabited dwelling under Louisiana law.[2]  On February 4, 2011, he was found to be

a fourth offender and was sentenced as such to a term of twenty years imprisonment.[3]  The Louisiana

Fourth Circuit Court of Appeal affirmed his conviction and sentence on September 26, 2012,[4] and

the Louisiana Supreme Court denied his related writ application on April 5, 2013.[5]

On or about May 21, 2013, petitioner filed the instant federal application for *habeas*

*corpus* relief, arguing that there was insufficient evidence to support his conviction.[6]  The state

concedes that the application is timely and that petitioner exhausted his remedies in the state courts.[7]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.

Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of

fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal

habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials'

---

[2] State Rec., Vol. III of IV, transcript of November 30, 2010, p. 65; State Rec., Vol. I of IV, minute entry dated November 30, 2010; State Rec., Vol. I of IV, jury verdict form.

[3] State Rec., Vol. III of IV, transcript of February 4, 2011; State Rec., Vol. I of IV, minute entry dated February 4, 2011.

[4] State v. Parker, No. 2011-KA-1714, 2012 WL 6619799 (La. App. 4th Cir. Sept. 26, 2012); State Rec., Vol. I of IV.

[5] State v. Parker, 110 So.3d 1075 (La. 2013); State Rec., Vol. I of IV.

[6] Rec. Doc. 1.

[7] Rec. Doc. 13.

and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." <u>Bell</u>, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme

> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state
> court unreasonably applies this Court's precedent; it does not require
> state courts to extend that precedent or license federal courts to treat
> the failure to do so as error. Thus, if a habeas court must extend a
> rationale before it can apply to the facts at hand, then by definition
> the rationale was not clearly established at the time of the state-court
> decision. AEDPA's carefully constructed framework would be
> undermined if habeas courts introduced rules not clearly established
> under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

## II. Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of the instant case as follows:

> Alvin Coleman, the victim, testified that on September 5, 2009, at approximately 5:30 a.m, Defendant knocked on the front door, bedroom window, and again on the front door of his home at 3704 Cherry Street in New Orleans, Louisiana. After hearing the knocking, Mr. Coleman said that he awoke, looked out his keyhole and observed Defendant. He testified that Defendant knocked down the front door of his residence, entered the residence,[FN2] and threatened to kill him if he did not give Defendant money. Mr. Coleman complied, and Defendant took his wallet, which contained approximately eighty dollars. After the incident, Mr. Coleman watched Defendant ride away on his bicycle.[FN3] Mr. Coleman called the police and gave them a statement.

> [FN2] Mr. Coleman testified that Defendant did not have permission to be in his home.

> [FN3] Mr. Coleman's testimony at the November 30, 2010 trial was as follows:

> > Q.  Okay. How did you see him leave on his bike?

> > A.  Well, I been to the glass there, and he rode off, because in all of this excitement, I was calling the police and waiting for the cops to come and tell them what happened.

> > Q.  Okay. How did you see him ride off? Where were you standing to see him ride off on this bicycle?

> > A.  I was in my house.

Q. Where in your house?

A. Right by the door after it got knocked down.

Q. Okay. Right by the door after it had gotten knocked down?

A. Yes.

Mr. Coleman acknowledged that he was discharged from the Navy after being diagnosed with paranoid schizophrenia, and that he regularly takes medication for that condition. He advised that he was regularly taking his medication on or around September 5, 2009, the time of the robbery. He testified that he was presently employed by Quiznos.

Mr. Coleman stated that as a result of the incident, he had a new security door and new screen installed. He identified the receipts showing that he purchased the security door on or about September 7, 2009. He installed the exterior security door on September 11, 2009. He also had a security system placed in his home.

Mr. Coleman testified that on October 2, 2009, at approximately 4:00 or 5:00 p.m., Defendant again appeared at the front door of his residence. Mr. Coleman claimed that Defendant had "three types of cardboard paper" as he stood outside his front door that day. When he saw Defendant, Mr. Coleman called the police "to prevent [Defendant] from robbing [him] again." That same day, Mr. Coleman observed Defendant in the police car down the street from his house. He said he recognized Defendant as the person who had robbed him. Accordingly, he told the police officer that Defendant was the person who had robbed him on September 5, 2009.

When asked how he recognized Defendant, Mr. Coleman testified, "[t]he same way I recognize him now" and that "[h]e looks the same." [FN4] Mr. Coleman stated that if anything were different, it was that Defendant was thinner at the time of the incident. Mr. Coleman also made an in-court identification of Defendant.

[FN4] Mr. Coleman testified that he does not wear glasses or contacts.

On cross-examination, Mr. Coleman testified that he did not personally know Defendant. When asked about his testimony at the May 11, 2010 trial, Mr. Coleman admitted that at that trial, he testified that the first time he saw the perpetrator was after Defendant knocked down the door and was lying parallel to the floor on top of the door. This account contrasted with his current testimony wherein he said that he first observed Defendant through his peephole. Mr. Coleman agreed that he initially told police that the person who robbed him was thin and wore a white t-shirt with some writing on it. Mr. Coleman conceded that at the August 30, 2011 trial, he testified that the perpetrator's shirt was either red or a rust-colored orange. However, Mr. Coleman subsequently clarified that the perpetrator "wore different shirts every time he came to my house" and that "[o]ne was white and another one was rust." When pressed further about the discrepancy, Mr. Coleman stated, "I might have stumbled a little bit, but I know what happened."

Mr. Coleman also acknowledged on cross-examination that he had previously testified that the perpetrator stole forty dollars from him, as opposed to eighty dollars. However, Mr. Coleman stated with regard to this discrepancy, "[i]t was either forty or eighty dollars, but I know that he took some money from me, though."

With regard to the October 2, 2009 incident, Mr. Coleman testified that Defendant came to his door at approximately 4:00 p.m., and that the iron security door was between them. He did not think that Defendant would come through the security door, but was concerned that he could be robbed again, so he called the police. Mr. Coleman testified that he thought Defendant wanted him to open the door "so he could run in on me and rob me again."

On redirect, Mr. Coleman was asked whether, besides Defendant's body and clothing, were there any other facial features by which he recognized Defendant. Mr. Coleman responded, "[w]ell, he was a little thinner back then, but you are talking over a year ago, since he has been in prison." When asked if he recognized Defendant's face at all, Mr. Coleman testified, "[y]es, I do."

Dr. Elizabeth Schwartz, an expert in psychiatry[FN5] who had treated Mr. Coleman for three years prior to the trial,[FN6] testified that he suffers from schizoaffective disorder. The disorder "has primarily symptoms of paranoia, mood instability, some anxiety symptoms, and sometimes psychotic symptoms like hallucinations and delusions." When Dr. Schwartz began treating Mr. Coleman, he had already been stabilized on medications, and his primary symptoms were trouble with sleeping and anxiety, as well as some

paranoid feelings.  Mr. Coleman's psychotic symptoms are like "a flash" in his peripheral vision, where he sees something for an instant.

> [FN5] The State offered a stipulation that Dr. Schwartz was an expert in psychiatry and paranoid schizophrenic disorders.

> [FN6] Dr. Schwartz testified that she treated Mr. Coleman from April of 2007 until she retired from the V.A. in May of 2011.

Dr. Schwartz testified that the medication does not affect his ability to recall events; Mr. Coleman "doesn't have standard visual hallucinations like you might in someone with schizophrenia," and his auditory hallucinations only involve his occasionally hearing his name being called.  Dr. Schwartz maintained that the medications would not cause Mr. Coleman to hallucinate a prolonged encounter with another person and that Mr. Coleman had never described such an encounter to her.  Dr. Schwartz also testified that Mr. Coleman's medications do not affect his ability to recall events or his ability to tell the truth.  She said that he is able to recall very well; takes his medication consistently, and has done so since before the September 5, 2009 incident.  Dr. Schwartz verified that Mr. Coleman did report the September 5, 2009 incident to her.  She advised that he was upset about the incident and had a few more problems with sleep and paranoia as a result; however, he had no problems with hallucinations.

On cross-examination, Dr. Schwartz testified that Mr. Coleman, while on his medications, "would see things the way any other normal person would."  In weighing Mr. Coleman's credibility, Dr. Schwartz testified that she would give him the same credibility as any other witness.

On redirect, she testified that Mr. Coleman has "just normal fear at this point in time" and that he was "fearful to stay in his home because he is worried about being broken into again."  Dr. Schwartz stated that his paranoia increased after the robbery, but not so much that he could not function.  Mr. Coleman still went to work and took care of his parents.  Dr. Schwartz denied that Mr. Coleman became "irrationally paranoid" after the incident.

Officer Rhonda McGowan with the New Orleans Police Department testified regarding her investigation of the September 5,

2009 incident.  Officer McGowan said that when she arrived at Mr. Coleman's residence, she noticed "damage to the front door, the lock and the door frame."  The Crime Lab dusted the door and the door knob for fingerprints; however, Officer McGowan testified that she did not know whether any prints were lifted from the door.[FN7]  No photos were taken.  After speaking to the detectives on the scene, her investigation was concluded.

> [FN7] Officer McGowan subsequently answered, "Yes, sir" when asked whether the Crime Lab technician, Emily Martinez, was "able to get any prints."

On cross-examination, Officer McGowan testified that she did not notice if the door was knocked off the hinges, but "just really noticed the door frame and the lock itself were damaged."  She noted that she arrived "a good time span later" and she "didn't know if the door could have been put back on the hinges."  Officer McGowan spoke to Mr. Coleman on the scene.  His description of the perpetrator was a thin, black male wearing a white t-shirt.  Officer McGowan testified that Mr. Coleman told her that he did not know the individual who burglarized him, but that he did see the individual who did come inside his house and, as he looked through the peephole, watched the individual ride away.  When asked how Mr. Coleman could see the perpetrator riding away by looking through the peephole, Officer McGowan testified that she arrived after a large span of time had passed, and she could not say whether the door was halfway off the hinges, or back on.  She recalled that when she arrived, she knocked on the door, and Mr. Coleman opened it; however, the door "was like ajar."

Officer McGowan did not canvass the area for witnesses, and could not say whether the detectives canvassed the area.  No physical evidence was collected by any members of the New Orleans Police Department pursuant to the investigation.  To her knowledge, there was not a warrant issued for Defendant.

Officer Terrence Hicks of the New Orleans Police Department testified that he responded to a call on October 2, 2009 for a suspicious person knocking on doors.  He observed Defendant, who matched the description, walking from the side of someone's yard.  Officer Hicks approached Defendant and asked him his name, who advised him that his name was "Johnny Tapp."  After Officer Hicks ran a computer check of the name "Johnny Tapp,"[FN8] he

discovered that a warrant was outstanding. Defendant was placed under arrest. At that time, Officer Hicks testified that "dispatch let me know, I guess, somebody was trying to get a hold of me saying that they recognized the gentleman as being the one that broke into their home and robbed them about a month or so previous[ly]." A few minutes later, "Mr. Coleman came banging on my window saying, 'That's the gentleman that robbed me.'" Officer Hicks denied seeing Mr. Coleman before he began banging on the window. He also denied calling Mr. Coleman over to his car.

> [FN8] Officer Hicks testified that he later discovered that Defendant's name was Joseph Parker.

After Mr. Coleman advised him that Defendant was the person who had robbed him, Officer Hicks asked Mr. Coleman for his address and his name. He "checked with dispatch to see if there was a burglary at that address, and they said that there had been." Officer Hicks testified that he then placed Defendant under arrest. After the booking process, Officer Hicks learned that Defendant's name was Joseph Parker.

On cross-examination, Officer Hicks confirmed that he had not met Mr. Coleman before he approached his vehicle, had no personal knowledge of the burglary on September 5, 2009, and was not one of the officers who investigated the burglary that day. He also said that on October 2, 2009, there was no arrest warrant issued for Joseph Parker. The municipal warrant for Johnny Tapp, the name Defendant gave Officer Hicks when he was initially detained, was for spitting in public. However, Officer Hicks did not know of the nature of the warrant at the time he arrested Defendant. Officer Hicks testified that when he arrested Defendant, he found a piece of paper with a list of names on it on his person, which he placed into evidence. He did not recall how many names were on the list or whether Mr. Coleman's name was on the list.

Defendant did not testify at trial.[8]

---

[8] State v. Parker, No. 2011-KA-1714, 2012 WL 6619799, at *1-4 (La. App. 4th Cir. 2012); State Rec., Vol. I of IV.

<u>III. Petitioner's Claim</u>

Petitioner claims that there was insufficient evidence to support his conviction. On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> In the sole assignment of error, Defendant argues that the evidence adduced at trial was insufficient to constitute proof beyond a reasonable doubt of both the elements of the offense and the identity of Defendant as the perpetrator, thereby denying him due process.
>
> In <u>State v. Brown</u>, the Louisiana Supreme Court set forth the standard for evaluating a claim of insufficiency of the evidence:
>
> > When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." <u>State v. Neal</u>, 00-0674, (La. 6/29/01) 796 So.2d 649, 657 (citing <u>State v. Captville</u>, 448 So.2d 676, 678 (La. 1984)).

<u>State v. Brown</u>, 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.

> The jury found Defendant guilty of simple burglary in the present matter. This Court recently reiterated the elements of the crime of a simple burglary of an inhabited dwelling in <u>State v. Ennis</u>:
>
> > This Court in <u>State v. Chairs</u>, 99-2908, pp. 8-9 (La.App. 4 Cir. 2/7/01), 780 So.2d 1088, 1094-95, discussed the elements the state must prove to support a conviction for simple burglary:
> >
> > > Defendant was convicted of simple burglary of an inhabited dwelling which is the unauthorized entry of any inhabited dwelling, house, apartment, or other structure used in whole or in

> part as home or place of abode by a
> person having the intent to commit a
> felony or theft therein. La. R.S.
> 14:62.2. Specific criminal intent is an
> essential element of the crime of
> simple burglary of an inhabited
> dwelling. State v. Richardson, 547
> So.2d 749, 751 (La.App. 4 Cir. 1989).
> Specific criminal intent is that state of
> mind that exists when the
> circumstances indicate that the
> offender actively desired the
> prescribed criminal consequences to
> follow from his act or failure to act.
> La. R.S. 14:10(1).

State v. Ennis, 2011-0976, p. 5 (La.App. 4 Cir. 7/5/12), – So.3d –, –
(quoting State v. Chairs, 99-2908, pp. 8-9 (La.App. 4 Cir. 2/7/01),
780 So.2d 1088, 1094-95).

Defendant makes several arguments in support of this
assignment of error. He principally argues that Mr. Coleman
provided varying accounts of the burglary, and that the physical
evidence introduced did not corroborate Mr. Coleman's account of
the events. Defendant references Mr. Coleman's prior testimony that
Defendant had knocked the door down and off its hinges and was
lying on top of it when he demanded money from Mr. Coleman with
his current testimony that he first saw Defendant through a peephole.
Additionally, Defendant notes that Mr. Coleman has at different
times stated that Defendant took "either forty or eighty dollars" from
him. When regarding this inconsistency, Mr. Coleman admits that he
"might have stumbled a little bit" but insists that "I know [Defendant]
took some money from me, though."

Another alleged inconsistency that Defendant cites is Mr.
Coleman's testimony where he told Officer McGowan that the burglar
was a "thin black male, [wearing a] white teeshirt." Defendant
maintains this testimony is inconsistent because at trial, Mr. Coleman
testified that the burglar wore a rust-colored shirt and identified the
burglar as "thin." Defendant avers that he was not and is not a thin
person.

Furthermore, Defendant emphasizes that Officer McGowan
testified that Mr. Coleman's door was not off its hinges as claimed by
Mr. Coleman. Although Officer McGowan saw damage to the lock

and the door frame, Defendant contends that Officer McGowan did not see the extensive damage that would verify Mr. Coleman's story of a forced intrusion into his home.

With regard to Dr. Schwartz's testimony, Defendant suggests that her observation that Mr. Coleman was more fearful and had problems with paranoia and sleep after the incident is corroborated by Mr. Coleman's installation of the new door and security system. Defendant maintains that Mr. Coleman's heightened anxiety and paranoia is apparent. He cites Mr. Coleman's testimony that he believed that he was going to be robbed even though a security screen door and steel door were between Mr. Coleman and any burglar on October 2, 2009. Defendant avers that it was this anxiety and paranoia that led to Mr. Coleman's misidentification of him. Defendant represents that his physical appearance does not match the one Mr. Coleman provided at the time of the incident.

Defendant also argues that the evidence was insufficient to convict because Mr. Coleman failed to explain an alleged delay of twenty to thirty minutes in reporting the crime and could not recall when or how many times he called the police. Defendant notes that the State did not introduce the 911 tapes or incident recall. Defendant also submits that the State did not have the officers who initially responded to the call testify at trial. Defendant cites Officer McGowan's testimony that when she arrived at Mr. Coleman's house, "everybody was already there and I just took the initial report."

It is well-settled that "in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion." State v. Higgins, 2003-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226 (citing State v. Robinson, 2002-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79; State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169). Defendant acknowledges this jurisprudential rule, but argues that the facts of this case are similar to those of State v. Mussall, 523 So.2d 1305 (La. 1988).

In Mussall, the Louisiana Supreme Court affirmed the appellate court's finding that no reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. Mussall, 523 So.2d at 1311. The eyewitness in Mussall was Ray Siebenkittel, who testified that he received a phone call at work from the defendant, Edward Mussall, whom he had met once briefly a few years prior, and who tried to interest Siebenkittel in purchasing or investing in a boat. Id. at 1306. After repeated phone calls, Siebenkittel said he

- 14 -

agreed to meet with Mussall to view the boat. He took his entire $4,000 savings and $2,000 he had borrowed from his sister. As Mussall and he walked along Governor Nichols Street, Mussall pulled a hand gun and robbed him of the $6,000 in cash. Id. at 1307.

Mussall testified in his own defense, asserting that Sibenkittel fabricated the robbery out of a desire for revenge from a failed drug deal with Sibenkittel and three other men. According to Mussall, these men fabricated a civil claim that Mussall had defaulted on a contract with them to sell shrimp and sought recovery of $45,000 for their investment in the venture, and that Sibenkittel sued to recover the $6,000 allegedly taken in the robbery and $100,000 in damages. Mussall introduced documentary evidence of the two lawsuits, which were both filed on the same date by the same attorney. Id.

The Louisiana Supreme Court noted that the State did not introduce any evidence to corroborate Siebenkittel's testimony, and that "[t]here was no other witness to the robbery itself or to any fact in Siebenkittel's version of his prior contact with Mussall." Id. Additionally, "[t]here was no corroboration of Siebenkittel's withdrawal or liquidation of $4,000 savings or of a $2,000 loan from his sister at 18 1/2% interest." Id. Likewise, the State did not introduce the handgun, the cash, the envelope, "or any evidence that Mussall had ever possessed any of them." Id.

The Louisiana Supreme Court found that "in this particular case even a reasonably pro-prosecution rational trier of fact is driven to have a reasonable doubt by the numerous eccentricities, unusual coincidences and lack of corroboration," concluding that the uncorroborated story was too far-fetched and would have created a reasonable doubt in the mind of a rational fact finder. Id. at 1311-12. Accordingly, Defendant argues Mr. Coleman's testimony in this case is too contradictory and bizarre for any rational fact finder to have believed it.

However, in State in the Interest of C.D., the Louisiana Supreme Court recently emphasized just how unusual the fact pattern in Mussall was, stating that "**Mussall stands as the single, sui generis, exception to that rule in this Court's jurisprudence** [that eyewitness testimony alone is usually sufficient], **and it is distinguished by its truly bizarre facts**.["] State in Interest of C.D., 2011-1701, p. 6 (La. 7/2/12), – So.3d –, – (emphasis added).

In C.D., a juvenile was charged with distribution of heroin and adjudicated delinquent by the trial court. C.D., 2011-1701, p. 1, – So.3d at –. At the delinquency hearing, New Orleans Police Officer Rafael Dobard, a six-year veteran of the Narcotics Unit, testified that

he received a tip from a confidential informant that heroin was being sold from a house at 2033 Wagner Street in the Fischer Housing Development. <u>C.D.</u>, 2011-1701, p. 1, – So.3d at –. Officer Dobard set up surveillance and observed a few drug transactions conducted by an African-American male at the residence who was wearing a black t-shirt and black shorts, and he was ultimately able to secure a warrant for 2033 Wagner Street. <u>Id</u>. at pp. 1-2.

When executing the warrant, Officer Dobard observed his suspect, the defendant, across the street from the residence, and he noticed that the defendant had on different clothing from what he was wearing during the drug transactions earlier in the day, as the defendant was now wearing a yellow, black and white plaid shirt and blue jeans. <u>Id</u>. at p. 3, – So.3d at –. The defendant was placed under arrest, and although $138.00 in cash was seized, no drugs or contraband were seized. <u>Id</u>.

On behalf of the defendant, his mother testified that the defendant had been helping her move that day. <u>Id</u>. Another witness for the defense, James Baker, testified that he was arrested at the same time as the defendant and that he never saw the defendant go to the Wagner Street residence. <u>Id</u>. at p. 4, – So.3d at –. The defendant testified that he was likely arrested because "they thought I looked like somebody," but conceded that he did not resemble anyone else in the housing development. <u>Id</u>.

This Court reversed the delinquency adjudication, finding that "any rational trier of fact, after viewing all of the evidence favorably to the prosecution, must have a reasonable doubt as to the defendant's guilt." <u>Id</u>. at p. 1 (quoting <u>State in the Interest of C.D.</u>, 2011-0121 (La.App. 4 Cir. 6/29/11), 69 So.3d 1219). The Louisiana Supreme Court reinstated the juvenile court's judgment. It disagreed with this Court's determination that the State's case "rested entirely on the uncorroborated testimony of Officer Dobard" which failed to "negate every reasonable probability of misidentification, especially given C.D.'s different clothing [at the time of arrest], the lack of drugs on his person, and his lack of connection to this part of the neighborhood and the 2033 Wagner residence." <u>Id</u>. p. 4 (quoting <u>C.D.</u>, 2011-0121, p. 7, 69 So.3d at 1223).

The Supreme Court also disagreed with this Court's finding that "there are instances in which 'numerous eccentricities, unusual coincidences and lack of corroboration' make such testimony so unreliable that even a reasonably pro-prosecution rational fact finder must have a reasonable doubt about the identification." <u>Id</u>. p. 5 (quoting <u>Mussall</u>, 523 So.2d at 1311). The Court found that "the

court of appeal erred in losing sight of the basic principle on review that the rational fact finder test of <u>Jackson v. Virginia</u>, 'does not permit a reviewing court to substitute its own appreciation of the evidence for that of the [fact finder].'" <u>C.D.</u>, 2011-1701, p. 6, – So.3d at – (quoting <u>State v. Lubrano</u>, 563 So.2d 847, 850 (La. 1990) (citing <u>State ex rel. Graffagnino v. King</u>, 436 So.2d 559 (La. 1983)). The Court emphasized that "an appellate court should ordinarily not assume 'the role of the fact-finder to weigh the respective credibilities of the witnesses" and thereby 'second guess the credibility determinations of the trier of fact beyond ... sufficiency evaluations under the <u>Jackson</u> standard of review.'" <u>Id</u>. (quoting <u>Graffagnino</u>, 436 So.2d at 563).

In rejecting the applicability of <u>Mussall</u>, the Court stated that "[t]he decision in <u>Mussall</u> has no bearing on the outcome in the present case because there was nothing 'eccentric' or 'unusual' about the testimony of Officer Dobard, an experienced narcotics officer who conducted a routine drug investigation in a routine manner, a 'mill run case' in which the police acted on a tip from a confidential informant, established a surveillance of the suspect location, and observed what then happened in an attempt to verify the information." <u>Id</u>. at p. 7, – So.3d at –. The Court acknowledged that Officer Dobard's vantage point did not afford him a view of the rear door of the residence, so "the officer may have missed defendant's departure, perhaps through the back exit, and subsequent appearance across the street wearing different clothing than worn by the suspected heroin dealer." <u>Id</u> . at p. 8, – So.3d at –. However, this vantage point, the Court reasoned, "did not negate the reasonable probability [that] Dobard made a reliable identification, based [on] his hours-long observation of the seller through binoculars, **because Dobard remembered what defendant looked like, notwithstanding [the fact that] he had changed outfits**." <u>Id</u>. (emphasis added).

In this case, the fact that the victim and eyewitness is a paranoid schizophrenic who provided slightly differing accounts of the incident does not make his testimony "unusual" or "eccentric,"[FN10] such that it rises to the level of <u>Mussall</u>. This is true particularly in light of Dr. Schwartz's testimony that the victim faithfully took his medication; would not hallucinate a prolonged event such as a robbery; "would see things the way any other normal person would;" and should be afforded the same credibility as any other witness.

Both the State and Defendant acknowledge the jurisprudential rule that if a key issue at trial is whether a defendant was the perpetrator, the State must negate any reasonable probability of misidentification in order to meet its burden, citing State v. Smith, 430 So.2d 31, 45 (La. 1983). The Louisiana Supreme Court has recognized that "an in-court identification may be permissible if there does not exist a 'very substantial likelihood of irreparable misidentification.'" [Manson v. Brathwaite, 432 U .S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977).] State v. Martin, 595 So.2d 592, 595 (La. 1992). The Martin Court further stated:

> Assuming a suggestive identification procedure, courts must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification. These factors were initially set out in Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and approved in [Manson v.] Brathwaite, supra. They include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Id. 432 U.S. at 114, 97 S.Ct. at 2253. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Id.; see also State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986); State v. Prudholm, 446 So.2d 729 (La. 1984); State v. Winn, 412 So.2d 1337 (La. 1982).

Martin, 595 So.2d at 595.

In this case, the first prong of the analysis, a suggestive identification procedure, is not alleged; rather, Defendant argues that Mr. Coleman's identification of Defendant was unreliable. Applying the Manson factors to the facts of this case, Mr. Coleman's testimony established that he 1) had an opportunity to view the perpetrator at the time of the crime; 2) had his attention clearly focused on the

perpetrator; 3) provided differing accounts of the perpetrator's shirt color and the exact amount of money that was the stolen wallet; 4) displayed a high level of certainty; and 5) identified Defendant approximately one month after the burglary.  See Martin, 595 So.2d at 595.  Under the totality of the circumstances, when we evaluate these factors, we conclude that they do not support a substantial likelihood of misidentification in this case.

We also find that Defendant's argument with regard to sufficiency of the evidence lacks merit.  Mr. Coleman testified that Defendant banged on his windows, kicked in Mr. Coleman's front door, and threatened to kill him if he did not give him any money, took his wallet, and fled on a bicycle.  Additionally, Officer McGowan's testimony corroborated that Mr. Coleman's door frame and lock were damaged.  Thus, the elements of a simple burglary were met in this case.  The evidence supports that Defendant made an unauthorized entry into Mr. Coleman's home and took his wallet.  See State v. Ennis, 2011-0976, p. 5, – So.3d at –.

As the Louisiana Supreme Court recently emphasized in C.D., when the trier of fact makes a credibility determination, great deference must be afforded to those findings:

> "When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings .... [unless] documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story .... a factfinder's finding ... based on its decision to credit the testimony of one of two or more witnesses ... can virtually never be manifestly erroneous or clearly wrong."  [ ]  [ (quoting Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989) ] (citing, *inter alia*, Mussall); see also Foley v. Entergy Louisiana, Inc., 06-0983, p. 10 (La. 11/29/06), 946 So.2d 144, 153 ("If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.") (citation omitted).

<u>C.D.</u>, 2011-1701, p. 9, – So.3d at –.

> In this case, the jury made a credibility determination based upon Mr. Coleman's eyewitness testimony.  Although there were some inconsistencies in Mr. Coleman's testimony, the damage to the door and lock were corroborated by Officer McGowan's testimony.  The record before us does not evidence a substantial likelihood of misidentification in this case.  The jury's factual findings were reasonable.[9]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[10]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); <u>Taylor v. Day</u>, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), <u>aff'd</u>, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing.

As correctly noted by the state court, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Id.</u> at 319.  Accordingly, "[t]he <u>Jackson</u> inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational*

---

[9] <u>Parker</u>, 2012 WL 6619799, at *5-11; State Rec., Vol. I of IV.

[10] <u>State v. Parker</u>, 110 So.3d 1075 (La. 2013); State Rec., Vol. I of IV.

decision to convict or acquit.'" <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting

<u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993)) (emphasis added); <u>see also</u> <u>Cavazos v. Smith</u>, 132 S.

Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of

the evidence challenge simply because the federal court disagrees with the state court. ... Because

rational people can sometimes disagree, the inevitable consequence of this settled law is that judges

will sometimes encounter convictions that they believe to be mistaken, but that they must

nonetheless uphold."). Moreover, because the state court's decision applying the already deferential

<u>Jackson</u> standard must be assessed here under the strict and narrow standards of review mandated

by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." <u>Parker v.</u>

<u>Matthews</u>, 132 S. Ct. 2148, 2152 (2012); <u>see also</u> <u>Coleman v. Johnson</u>, 132 S. Ct. 2060, 2062

(2012).

In the instant case, the elements of the crime of simple burglary of an inhabited

dwelling were established through the victim's testimony. Generally, a victim's testimony and

positive identification of a defendant is alone sufficient evidence to support a conviction. <u>Peters v.</u>

<u>Whitley</u>, 942 F.2d 937, 941-42 (5th Cir. 1991); <u>see also</u> <u>Fetterley v. Whitley</u>, No. 94-30310, 1994

WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994); <u>Holderfield v. Jones</u>, 903 F. Supp. 1011, 1017 (E.D.

La. 1995). Moreover, although petitioner disputes the credibility of the victim, witness credibility

is an issue for the jury, not a federal *habeas* court. Where a petitioner's insufficient evidence claim

is based on the credibility of a witness, a federal *habeas* court generally will not grant relief. <u>See</u>

<u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995) ("[U]nder <u>Jackson</u>, the assessment of the credibility of

witnesses is generally beyond the scope of review."); <u>Ramirez v. Dretke</u>, 398 F.3d 691, 695 (5th Cir.

2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict.");
McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of
the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Phillips v. Cain,
Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL
2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5
(E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed in the light most favorable to
the prosecution, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner
cannot show that the state court's decision rejecting his claim was contrary to, or involved an
unreasonable application of, clearly established federal law, as determined by the Supreme Court
of the United States.  Accordingly, under these doubly-deferential standards of review which must
be applied by this federal *habeas* court, the claim should be denied.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition of **Joseph Parker** for
federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and
recommendation in a magistrate judge's report and recommendation within fourteen (14) days after
being served with a copy shall bar that party, except upon grounds of plain error, from attacking on
appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district
court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[11]

New Orleans, Louisiana, this third day of October, 2014.

_____
**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[11] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.